# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN THE MATTER OF AN           :
APPLICATION OF THE UNITED   : Case No. 24-mj- 279 RMS
STATES OF AMERICA FOR        :
FOUR SEARCH WARRANTS      :

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Anthony Fasulo, being duly sworn, depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1. I, Anthony Fasulo, am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I am currently assigned to the New Haven District Office Task Force.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am currently employed by the Connecticut State Police, and have been since June 2015. I have been assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer (TFO) since May 2021. During my tenure as a police officer and Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking. I am currently assigned to the New Haven District Office, Organized Crime Drug Enforcement Task Force, ("Task Force") which is composed of personnel from the DEA, United State Marshal Service ("USMS"), New Haven Police Department ("NHPD"), West Haven Police Department ("WHPD"), Branford Police Department, ("BPD"), Meriden Police Department ("MPD"), Ansonia Police Department ("APD"), Middletown Police Department ("MPD"), Naugatuck Police Department ("NPD"), and Waterbury Police Department ("WPD").

3.      I have received instruction relative to conducting drug investigations while attending the Connecticut Police Academy (POSTC) in Meriden, Connecticut, as well as other training classes relative to narcotics trafficking. Over the past seven (7) years in law enforcement, I have participated in the execution of numerous seizure warrants which have resulted in the seizure of narcotics, United States currency, assets acquired with drug proceeds and assets utilized to facilitate drug activities. I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, participated in controlled purchases of illegal drugs utilizing cooperating witnesses, confidential sources and undercover agents/officers, and obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs. As a result of my training and experience, I am familiar with the manners in which controlled substances are commonly brought to Connecticut, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and organizations that illegally transport and distribute controlled substances, as well as the devices commonly utilized by them.

4.      I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, coordinated controlled purchases of illegal drugs utilizing cooperating witnesses, confidential sources and undercover agents/officers, and obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs. As a result of my training and experience, I am familiar with the manner in which controlled substances are commonly imported, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and

organizations that illegally import and distribute controlled substances, as well as the devices commonly utilized by them.

5.      As a result of my training and experience, I am familiar with the behaviors, methods and common practices employed by drug traffickers, including but not limited to those discussed below.

6.      I am familiar with the paraphernalia and devices commonly utilized by narcotics traffickers.

7.      I am familiar with and have analyzed records documenting the illegal purchase of and sale of controlled substances

8.      I am familiar with the practices commonly employed by narcotics traffickers to avoid detection by law enforcement

9.      Based on my training and experience, I also know that powder drugs, such as heroin, leave microscopic residue on the surfaces of objects they have come in contact with, such as storage containers, which residue can be acquired, preserved and analyzed with equipment available to law enforcement.

11.     Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

a.      drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

b.      even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

e.      drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f.      drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.      drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of current and past drug associates within their residences;

h.      drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

i.      drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of

drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

j.     drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

k.     persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.     Drug traffickers and gang members often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers and gang members possession or residence;

m.     The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York and in this investigation Puerto Rico and California to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments and government/contract mail carriers. The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

n.     based on my training and experience, drug traffickers and violent street gang members commonly have firearms and other weapons in their possession, in their cars, on their

person, at their residence including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers, drugs, drug proceeds, and property;

o. Based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug proceeds, drug inventory and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, or in the residences or cars of their trusted associates; based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often have, possess, maintain and control the items listed in Schedules A and B to this affidavit, in their homes, garages, out-buildings, and cars;

12. I know that persons possess in their residence over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, check books, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine introductions, and undeveloped film containing photographs (when developed) of themselves occupying the property.

13. This affidavit is submitted in support of an application for a warrant to search the following three premises and one vehicle (collectively, the "SUBJECT PREMISES"), which are further described in Attachment A-1, A-2, A-3 AND A-4.

A. **SUBJECT PREMISES 1,** 609 Campbell Avenue, Apartment A, West Haven, CT is an apartment above retail businesses. The structure is building with yellow siding above the retail stores, with black shutters, and white trimmed windows. The front

door for the residence is white in color with glass in the middle and the number 609 above the door. The entrance into Apartment A is in the rear, which is a green door, closest to the public sidewalk on Ashburton Place. The door is not marked. Subject Premises 1 is further described in Attachment A-1.

B. **SUBJECT PREMISES 2,** 736 Washington Avenue, New Haven, Connecticut (**Subject Premises** 2), which is a single family home, beige in color, white window trim, and the number 736 on the front porch post. The driveway is to the left of the residence, with a chain link fence leading from the public sidewalk to the front steps and entry way of the residence. Subject Premises 2 is further described in Attachment A-2.

C. **SUBJECT PREMISES 3,** 7 Woosley Street, Second Floor and Attic, New Haven, Connecticut, is the second floor and attic of a multi-family home. The structure is separated into 1st and 2nd floor residences, has beige siding, with a dark blue front door, with brown and white trimmed windows, and the number 7 above the affixed mail box to the right side of the door. Subject Premises 3 is further described in Attachment A-3.

D. **SUBJECT VEHICLE 1,** a blue 2024 Nissan Altima, bearing New York Registration LGG1208.

14. As part of my duties, I am currently participating in an investigation into suspected ongoing narcotics trafficking, in violation of 21 U.S.C. §§ 841(a)(1) and 846 by Levern MARION and others identified and unidentified individuals. Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics) and 846

(conspiracy to distribute and possess with intent to distribute narcotics) (hereafter referred to as the "Target Offenses") have been committed, are being committed, and will be committed by these individuals.

15.     I am familiar with the facts and circumstances of the aforementioned investigation as a result of my personal participation in the investigation; from discussions with agents of the DEA and other law enforcement personnel; from information provided by witnesses involved in the investigation; from my review or the reviews by others to whom I have spoken of pen register and telephone toll records; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable.

## II.     PROBABLE CAUSE FOR 736 WASHINGTON AVE, APARTMENT A, NEW HAVEN, CT

16.     Since on or about March 2024, members of the DEA New Haven District Office along with members of the New Haven Police Department have been investigating a Drug Trafficking Organization (DTO) led by Levern MARION.  Law Enforcement has conducted surveillance operations, trash pull operations, and traffic stops in order to gain intelligence on the MARION DTO.

### A.  SURVEILLANCE OPERATION

17. On March 4, 2024, members of the DEA New Haven District Office, New Haven Police Department Criminal Intelligence Unit, and West Haven Police Street Crime Unit conducted surveillance of the **Subject Premises 1**, 609 Campbell Avenue, Apartment A, West Haven, CT. This address is the suspected residence of MARION. Investigators also suspected MARION to be operating a black Mazda SUV, bearing PA Registration LCH1516 and during this operation, the vehicle was parked on the corner of Ashburton Place and Campbell Avenue, on the side of the residence. At approximately 11:35 A.M., investigators observed a black male, later identified as Lavern MARION, exit the rear door of 609 Campbell Avenue and proceeded to walk onto Ashburton Place and enter the driver seat of the black Mazda. The vehicle then departed the area and was followed by investigators where it made a stop in the Hill Section of New Haven across from the Key Food Grocery Store located at 482 Greenwich Avenue, New Haven, CT. The male operator of the Mazda was observed speaking with a black male on the sidewalk for a brief period of time before departing the area. Surveillance units maintained a constant visual of the Mazda where it was followed pulling into the driveway of 736 Washington Avenue, at approximately 11:47 A.M. The black male operator exited the vehicle and entered the front door of Subject Premises 2, 736 Washington Avenue. At approximately 11:54 A.M., the black male is observed exiting the residence of 736 Washington Avenue and entered the black Mazda. The black Mazda is then observed backing out of the driveway and continued on Washington Avenue before pulling into the Best Deli Food Store located at 339 Ella T. Grasso Boulevard, New Haven, CT. The black Mazda is observed pulling alongside a Honda Accord and conducted a suspected hand-to-hand transaction with the operator of the Honda. The black male in the Mazda then departed the grocery store and proceeded to travel on Washington Avenue towards 736 Washington Avenue. Surveillance units continued to follow the black Mazda where it was

followed to Hallock Avenue where it then parked in front of 29 Hallock Avenue, New Haven. The black male was observed exiting the vehicle and walking to the rear of 29 Hallock Avenue. A short time later the black male emerged from the rear of 29 Hallock and entered the black Mazda. The black Mazda departed the area as surveillance units continued to follow. The black Mazda then was observed traveling on Washington Avenue and was observed backing into the driveway of 736 Washington Avenue. At approximately 12:07 P.M., members from the NHPD conducted a motor vehicle stop of the operator of the black Mazda. During the course of the stop the black male was detained and identified as Levern MARION (DOB 03/11/1989). MARION and his vehicle were searched and investigators located a large sum of U.S currency on his person. A search of the vehicle yielded negative results for weapons or contraband. MARION was not arrested and was released on scene without incident. Through Law Enforcement databases, MARION was found to have a criminal history to include possession of narcotics and sale of narcotics.

### B. TRASH PULL OPERATION #1 AT 736 WASHINGTON AVENUE

18.     On March 6, 2024 members of the DEA New Haven District Office and the New Haven Police Department Criminal Intelligence Unit formulated plans to conduct a trash pull operation at Subject Premises 2, 736 Washington Avenue, New Haven, CT. In total, three trash bags were pulled from the garbage containers. Multiple items were seized as evidence and are as follows:

Bag #1: Bag #1; One (1) AARP Letter Addressed to Vermell Gallishaw, one (1) plastic sandwich bag.

Bag #2: One (1) piece of mail addressed to Levern Marion, four (4) used rubber gloves, two (2) plastic sandwich bag containing a white, powdery substance.

Bag #3: One (1) brown cardboard box containing numerous white wax folds stamped "Kiss Me," thirty-five (35) plastic sandwich bags with cut corners, one (1) large plastic vacuum sealed bag containing white, powdery residue, one (1) small plastic piece of vacuum sealed bag containing a white, powdery residue, twenty-five (25) plastic sandwich bags containing white, powdery substance, twenty-seven (27) empty small green and clear Ziploc baggies, twenty-two (22) used rubber gloves, three (3) clear "Apple" bags, one (1) of which containing a white, rock-like substance, four (4) razor blades containing a white, powdery residue.

19.   During the processing of the evidence located, Detective Vakos (NHPD) subjected items to field testing. The following items were tested:

* One (1) of the clear plastic sandwich bags found in bag #1. This was tested using a Sirchie cocaine wipe, which yielded a positive result for presence of cocaine.

* One (1) of the clear plastic sandwich bags found in bag #3. This was tested using a Sirchie cocaine wipe, which yielded a positive result for presence of cocaine.

* The one (1) large plastic vacuum sealed bag found in bag #3. This was tested using a Sirchie cocaine wipe, which yielded a positive result for presence of cocaine.

* The one (1) small plastic piece of vacuum sealed bag found in bag #3. This was tested using a Sirchie cocaine wipe, which yielded a positive result for presence of cocaine.

20.     Detective Vakos also tested a portion of the white, rock-like substance located in bag #3 using a SIRCHIE cocaine tester. The test yielded a positive result for the presence of cocaine. Detective Vakos then tested a portion of the white, powdery substance from one (1) of the clear plastic sandwich bags found in bag #3 using a SIRCHIE field tester. The test yielded a positive result for the presence of Fentanyl.

## C. TRASH PULL OPERATION #2 AT 736 WASHINGTON AVENUE

21.     On March 13, 2024 members of the DEA New Haven District Office and New Haven Police Department Criminal Intelligence Unit formulated plans to conduct a trash pull operation at 736 Washington Avenue, New Haven, CT. Investigators removed four (4) trash bags from the garbage containers. During the search of the bags, multiple items were seized as evidence. Evidence seized during the trash pull operation were (15) fifteen latex gloves, (14) sandwich bags that contained a white powder substance, and (1) one Ziploc style bag. During the processing, the sandwich bags that contained a white powder substance were subject to a field test. Results indicated the presence of cocaine within the sandwich bags.


## E. SURVEILLANCE OPERATION MARCH 19, 2024

22.     On March 19, 2024 members of the DEA New Haven District Office and New Haven Police Department Criminal Intelligence Unit formulated plans to conduct surveillance of Levern MARION. Prior to surveillance being established at 609 Campbell Avenue, West Haven, DEA TFO Ramonel Torres has been monitoring numerous surveillance cameras in the area of 7 Woolsey Street, New Haven, CT. TFO Torres was monitoring the Pole Camera in the area of 7 Woolsey Street from March 18, 2024, and observed a newer model blue Nissan sedan. TFO Torres with the assistance of the NHPD criminal intelligence center was able to check License

Plate Readers (LPR) and Pole Cameras and identified a blue Nissan Altima bearing New York Registration LGG1208. A COLLLECT/NCIC check of NY Registration LGG1208 yielded the vehicle was registered to EAN Holdings which is an Enterprise Rental vehicle. TFO Savo contacted the Enterprise Rental Law Enforcement line and inquired about the blue Nissan Altima bearing NY Registration. Enterprise Advised TFO Savo the vehicle was rented to Allise LOWERY (DOB XX/XX/1983, the full DOB is known to Your Affiant).

23.    At approximately 10:30 A.M., Members of the DEA and NHPD established surveillance in the area of Campbell Avenue and Ashburton Place in West Haven. TFO Fasulo observed the blue Nissan Altima bearing NY Registration LGG1208 parked on the left side of the street of Ashburton Place near the corner of Campbell Avenue. At approximately 1:01 P.M., TFO Joseph Harrington observed a male exiting the rear green door of 609 Campbell Avenue in West Haven. DEA TFO Harrington was able to positively identify this male as MARION. DEA TFO Harrington observed MARION wearing all black and walk on Ashburton Place and enter the driver seat of Subject Vehicle 1, a blue Nissan Altima bearing NY Registration LGG1208. Moments later MARION was observed departing the area where he proceeded to travel on Ashburton Place to Elm Street. Mobile surveillance units maintained a constant visual of MARION'S vehicle to where he was followed directly to Subject Premises 2, 736 Washington Avenue, New Haven. MARION was observed walking into the residence for a brief period of time before exiting the residence and entering the Blue Nissan Altima. MARION then departed Subject Premises 2, 736 Washington Avenue, where surveillance units maintained a constant visual. MARION was followed to downtown New Haven and parked his vehicle at the corner of Church Street and Chapel Street. MARION left the vehicle running with the hazard lights on as he exited the vehicle and entered the Snipes Clothing store located at 868 Chapel

Street. MARION was observed in the clothing store for a brief period of time before exiting with a clothing bag. MARION then entered the Nissan and departed the area. MARION was followed onto Interstate 91 South and proceeded to merge onto Interstate 95 South before exiting Exit 46.

24.     MARION was followed off of the exit and pulled into a commuter parking lot across from the Vietnam Veteran Memorial, located on Long Wharf Drive. MARION was observed meeting with a middle-aged white male wearing a red jacket. The white male was observed speaking with MARION on the passenger side window. While MARION was speaking with the white male in the red jacket, a black vehicle pulled into the commuter lot and was observed pulling along the driver side of MARION. Investigators observed a hand-to-hand transaction between MARION and the operator of the black vehicle. MARION moments later departed the area. Approximately one minute later the black vehicle that met with MARION exited the commuter lot. Investigators then proceeded to follow the black vehicle that was bearing Connecticut Registration BF43467 to Howard Avenue. A COLLECT/NCIC check yielded the vehicle was a misuse of marker plates and belonged to a yellow Mini-Cooper to Carrie Torres. TFO Eannotti activated his overhead lights and sirens from his unmarked police vehicle and conducted a motor vehicle stop on Howard Avenue. Investigators approached the vehicle and made contact with a Hispanic male who was identified as Domingo TORRES (DOB XX/XX/1980, the full DOB is known to Your Affiant). Investigators explained the reason for the stop and explained to TORRES that he was suspected of conducting a hand-to-hand transaction. TORRES was asked what he purchased from MARION. TORRES was cooperative and stated he purchased a $20 dollar piece of crack-cocaine. TORRES voluntarily relinquished one small clear zip-lock style bag that further containing a white rock like substance of suspected

crack-cocaine.  TORRES provided investigators with MARION'S phone number to which he

knows as "Jayson" (XXX) XXX-5322, the full phone number is known to Your Affiant, that he

called to facilitate the drug transaction.  TORRES also described MARION as a taller black male

wearing a blue jean jacket.  TORRES was then released on scene without incident.

**F.  INVESTIGATION INTO 7 WOOLSEY STREET, 2nd FLOOR, NEW HAVEN, CT**

25.      During the months of November 2023 to January 2024 the New Haven Police

Department received information from concerned citizens of drug activity occurring at 7

Woolsey Street, 2nd Floor, New Haven, CT (Subject Premises 3).  On January 11, 2024 members

of the New Haven Police Department conducted a trash pull operation at 7 Woolsey Street, New

Haven, CT.  During this operation, investigators seized multiple items of evidentiary value from

the trash cans at 7 Woolsey Street, New Haven, CT.  While pulling the trash at the residence

DEA TFO Torres observed the garbage cans to be on the curb and clearly marked by numbers

pertaining to each floor.  DEA TFO Torres then pulled the trash out of the garbage can labeled

"2" and departed the area.  During the search of the garbage bags investigators observed several

sandwich bags with cut corners, several empty small Ziploc style bags, which contained a white

powder residue.  DEA TFO Torres subjected a cut corner of a sandwich bag, which yielded a

positive result for the presence of fentanyl.  Also inside of the garbage bags with the evidence

that was seized, were two receipts with the name Adrienne Carmen.  Through Law Enforcement

databases and New Haven Police incident reports, Carmen is known to be residing on the second

floor of the residence.

26.      On March 20, 2024, members of the DEA New Haven District Office formulated plans to

conduct a controlled purchase utilizing a New Haven Police Confidential Source, hereinafter

referred to as "CS" to make a controlled purchase of illegal drugs from 7 Woolsey Street, New Haven, Connecticut. The CS has proven to be both credible and reliable in past investigations, which has led to arrests and convictions in a court of law.

27.    At approximately 1:36 P.M., DEA TFO Eanotti and DEA TFO Torres met with the CS at an undisclosed location to make a controlled purchase of an illegal substance from 7 Woolsey Street, New Haven, Connecticut. At that time, DEA TFO Torres searched the CS for excess money and/or contraband. The search yielded negative results, and the CS was provided with certain amount of New Haven Police Department Official Authorized Funds (OAF) to conduct the transaction. At approximately 1:38 P.M., the CS left a clandestine location and traveled in the direction of 7 Woolsey Street, New Haven, Connecticut. Investigators were able to maintain constant surveillance of the CS as they walked to 7 Woolsey Street, New Haven, Connecticut.

28.    At approximately 1354 hours, the CS arrived at the pre-arranged location and met with DEA TFO Eanotti and DEA TFO Torres where the CS relinquished custody of four (4) white wax-folds containing a white powdery substance weighing approximately .8 grams including packaging. At that time, DEA TFO Torres searched the CS again and found free of any excess money and/or drugs.

29.    The following information was gathered by DEA TFO Torres and DEA TFO Eannotti. The CS stated that he/she walked to the front of 7 Woolsey Street, New Haven and yelled to get the attention of someone inside of 7 Woolsey Street. A few moments later a tall dark skin male with a tattoo on his face, later identified to be Levern MARION exited the front door of 7 Woolsey Street carrying a baseball bat. The CS stated he/she asked MARION for "paper," street terminology for heroin. The CS stated MARION took the money from them and said he was going to call "Gordo" which is the alias for Jeniel Colon-TALAVERA to come serve him/her.

MARION then directed the CS to wait near the residence. The CS stated while they were waiting for "Gordo" another person arrived and asked MARION for crack/cocaine and handed MARION money. The CS stated MARION then entered a blue sedan bearing out of state marker plates retrieved an item and handed it over to the person waiting. The CS stated that MARION then entered the residence of 7 Woolsey Street, New Haven, CT with the money previously given to him by the CS. The CS stated that a few moments later a Hispanic male, who the CS identified as "Gordo" arrived in front of 7 Woolsey Street, New Haven, CT on a bicycle to conduct the transaction. Through CS information and law enforcement intelligence, narcotic traffickers utilize the residence, to include MARION, the second floor of the residence to facilitate their narcotic activities. Also within the second floor is a door, only accessed from the 2nd floor apartment, that leads to an attic where it is suspected that narcotics are being stored.

30. On March 27, 2024 at approximately 11:58 A.M., New Haven Police Patrol Units were conducting routine patrol in the area of Woolsey Street, when they observed a black male conduct what they perceived as a hand to hand transaction. When the officers attempted to stop the male, the male ran on foot from the officers into the rear of 7 Woolsey Street and up the stairs to the second floor. Officers then entered the rear of 7 Woolsey Street and went to the second floor and knocked on the door and encountered Adrienne Carmen. Officers requested spoke to Carmen and asked her where the person that ran inside inside of the residence was hiding. Carmen stated that the male was in the attic of the second floor. The male was requested to exit the attic, which he did without incident and was taken into custody. While speaking with the later identified juvenile male, he explained that when he ran into the second floor, he flushed the narcotics down the toilet in the second floor bathroom. Officers stated that prior to taking the juvenile into custody they could hear the juvenile running through the second floor kitchen and

into the attic. Officers also stated that the juvenile while inside changed his clothing and had a large amount of U.S. Currency on his person.

## G. SURVEILANCE OF 7 WOOLSEY, 2ND FLOOR, NEW HAVEN, CT

31.     On March 25, 2024, members of the New Haven District Office Task Force (NHDO TF) conducted electronic and mobile surveillance in the vicinity of 7 Woolsey Street, New Haven, Connecticut (CT). Electronic surveillance was conducted utilizing a Connecticut State Police (CSP) camera mounted in a fixed position overlooking Woolsey Street. At approximately 7:32 P.M., Group Supervisor (GS) Raymond McGrath and Task Force Officer (TFO) Rey Torres reviewed CSP footage in real time and observed a tall, thin unidentified male (UM1) wearing dark clothing walk from the direction of Subject Premises 3 and meet briefly with a light-skinned unidentified male (UM2) wearing a dark colored hat and dark clothing. After less than a minute the two separated. UM2 walked to a bicycle which was lying on the ground and departed the area. UM1 walked to the front steps of Subject Premises 3. UM1 stood on the porch of Subject Premises 3 for several moments before another unidentified male (UM3) wearing a lighter colored shirt/jacket with a hood up walked down Woolsey from Poplar Street. UM1 and UM3 appeared to look at each other. UM1 turned and entered the front door to Subject Premises 3 as UM3 turned away from the detection he was walking and appeared to wave his arms in a manner consistent with a person waiting for something/someone. UM3 then sits down on the wall and waits. At approximately 7:33 P.M., UM1 exits the front of Subject Premises 3. UM1 has a distinctive white shirt or garment running across the waist/stomach of UM1's clothing. UM3 sees UM1 and stands up. The two walk to each other and speak for several seconds before departing. UM3 walks away towards Poplar Street. UM1 walks back up the stairs and into Subject Premises 3. Investigators while observing the area and Subject Premises 3 through their

training and experience suspect these short interactions to be hand to hand narcotic transactions. It also appears that Subject Premises 3 is being utilized to facilitate these narcotic transactions by storing and/or distributing narcotics from the residence. At approximately 7:57 P.M., DEA TFO Torres observed a blue sedan park on the street blocking the driveway to Subject Premises 3. The vehicle was consistent with a rental vehicle currently in the possession of Levern MARION based on previous surveillance operations. At approximately 8:01 P.M., GS McGrath began mobile surveillance on Woolsey Street. GS McGrath observed the blue Nissan sedan parked in front of Subject Premises 3.

32.     At approximately 8:05 P.M., TFO Eannotti conducted electronic surveillance and observed an unidentified female (UF1) carrying a dark colored shopping bag stop in front of Subject Premises 3 and look in the direction of the blue Nissan. After several moments, TFO Eannotti observed UF1 walk towards Poplar Street. GS McGrath, conducing mobile surveillance, observed UF1 walk on Poplar Street towards Grand Avenue. GS McGrath observed UF1 meet with a second unidentified female (UF2) with light colored hair and an unidentified male (UM4) near the corner of Grand Ave. UF2 was looking at a small object in the palm of UF2's hand. Through training and experience this observation is consistent with a suspected hand to hand narcotics transaction.

33.     At approximately 8:39 P.M., GS McGrath drove down Woolsey Street and observed the front license plate to the blue Nissan as New York registration LGG1208. Mobile and electronic surveillance showed that during the time of the above suspected narcotics transactions, the lights to the first floor of 7 Woolsey Street, New Haven, CT were off. The lights to the second floor of 7 Woolsey Street, New Haven, CT, Subject Premises 3, were consistently on. The lights above the second floor of 7 Woolsey Street, New Haven, CT, the attic, were also on periodically. As

noted above, the second floor has the sole access to the attic of the residence only through the interior of the second floor apartment.

34.     At approximately 8:46 P.M., TFO Eannotti electronically observed a male and a suspected female exit Subject Premises 3.  The male entered the Blue Nissan which then drove away.  Moments later the female pulled a vehicle into the driveway of Subject Premises 3 and exited with two children.  While observing the pole camera is real time, investigators have observed heavy pedestrian traffic in the area of Subject Premises 3.  Several other suspected hand to hand transactions were observed at the residence.

35.     It should be noted that in the area of 736 Washington Avenue and 7 Woolsey Street, New Haven, CT there has been numerous calls for service in the City of New Haven for acts of violence, specifically gun violence, within the past month.  Through my training and experience I know that rival drug dealers and gang members have conflict over areas in which to sell narcotics.  Also members of these organizations tend to use violence as a deterrent to other rival drug dealers to keep of out their area.

### H. 609 CAMPBELL AVENUE, APARTMENT A, WEST HAVEN, CT

36.     During the course of this investigation, MARION has been identified as residing at 609 Campbell Avenue, Apartment A, West Haven, CT.  During surveillance operations, investigators were able to observe the vehicles MARION parked on the street, near the rear door for the apartment.  To confirm MARION is residing at this residence, investigators issued an administrative subpoena for the utility holder.   On March 25, 2024, investigators received the subpoena return and results from the United Illuminating (UI) Company showed that MARION is listed as the account holder for this residence.

37.  Throughout the course of the investigation into the MARION DTO, investigators have observed MARION leave directly from 609 Washington Avenue, Apartment A, West Haven, CT, and go directly to a suspected narcotic stash location, 736 Washington Avenue, New Haven, CT.  It is suspected that MARION keeps narcotic proceeds, narcotic paraphernalia, and documentation that would facilitate narcotic trafficking inside of the residence of 609 Campbell Avenue, Apartment A, West Haven, CT.  Through my training and experience, I know that drug traffickers separate the actual narcotic product from any narcotic proceeds and personal affects that are gained from trafficking activities.  This is an attempt to deceive and/or thwart law enforcement from locating narcotics and/or narcotic proceeds.

## <u>CONCLUSION</u>

38.     Based on the information set forth above, as well as my training and experience and that of other law enforcement personnel participating in this investigation, I believe that MARION is using the Subject Premises and Subject Vehicle to store and distribute narcotics, and searches of both are likely to lead to the discovery of evidence of drug trafficking activity, including quantities of narcotics, cash, and other facilities of the drug trafficking trade.

39.     Based on the foregoing, there is probable cause to believe, and I do believe, that fruits, instrumentalities and evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 will be found at the Subject Premises and inside the Subject Vehicle as described above, and that a warrant to search the Subject Premises and Subject Vehicle should issue.

Respectfully submitted,

Anthony Fasulo
Digitally signed by Anthony Fasulo
Date: 2024.03.27 16:07:51 -04'00'

Anthony Fasulo
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me by telephone this **27th** day of March, 2024.

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2024.03.27 18:40:28 -04'00'

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

(Subject Premises 1 – 609 Campbell Avenue, Apartment A, West Haven, Connecticut)





**Subject Premises 1** is more particularly described as follows: 609 Campbell Avenue, Apartment A, West Haven, CT is an apartment above retail businesses. The structure is building with yellow siding above the retail stores, with black shutters, and white trimmed windows. The front door for the residence is white in color with glass in the middle and the number 609 above the door. The entrance into Apartment A is in the rear, which is a green door, closest to the public sidewalk on Ashburton Place. The door is not marked.

## ATTACHMENT B-1

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. Secs. 841(a)(1) and 846, namely:

a.　　Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

b.　　Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

c.　　Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

d.　　Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

e.　　Cellular/digital wireless telephones, and smart cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes; personal computers, I-Pads, and other computerized devices capable of storing data electronically, and the contents thereof;  external hard drives, thumb drives, memory cards, CDs and DVDs capable of storing data electronically, and the contents thereof; should any such items be seized, investigators will seek further legal process to review the contents stored on these devices.

f.　　Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

g.　　Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

h.　　Firearms and ammunition.

i.　　Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursements of funds.

(Subject Premises 2 – 736 Washington Avenue, New Haven, Connecticut)



**Subject Premises 2** is more particularly described as follows: 736 Washington Avenue, New Haven, Connecticut (**Subject Premises** 2),  which is a single family home, beige in color, white window trim, and the number 736 on the front porch post.  The driveway is to the left of the residence, with a chain link fence leading from the public sidewalk to the front steps and entry way of the residence.

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. Secs. 841(a)(1) and 846, namely:

a.     Controlled substances, including, heroin; fentanyl; crack cocaine; residue of heroin and fentanyl;

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

c.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

f.     Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

g.     Cellular/digital wireless telephones, and smart cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes; personal computers, I-Pads, and other computerized devices capable of storing data electronically, and the contents thereof; external hard drives, thumb drives, memory cards, CDs and DVDs capable of storing data electronically, and the contents thereof; should any such items be seized, investigators will seek further legal process to review the contents stored on these devices.

h.     Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.     Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

j.     Firearms and ammunition.

k.     Titles of vehicles, motorcycles, boats, and other property;

l.      Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursements of funds.

(Subject Premises 3 – 7 Woolsey Street, 2nd Floor and Attic, New Haven, Connecticut)



**Subject Premises 3** is more particularly described as follows: 7 Woolsey Street, Second Floor and Attic, New Haven, Connecticut, is the second floor and attic of a multi-family home. The structure is separated into 1st and 2nd floor residences, has beige siding, with a dark blue front door, with brown and white trimmed windows, and the number 7 above the affixed mail box to the right side of the door.

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. Secs. 841(a)(1) and 846, namely:

a.     Controlled substances, including, heroin; fentanyl; crack cocaine; residue of heroin and fentanyl;

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

c.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

f.     Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

g.     Cellular/digital wireless telephones, and smart cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes; personal computers, I-Pads, and other computerized devices capable of storing data electronically, and the contents thereof;  external hard drives, thumb drives, memory cards, CDs and DVDs capable of storing data electronically, and the contents thereof; should any such items be seized, investigators will seek further legal process to review the contents stored on these devices.

h.     Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.     Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

j.     Firearms and ammunition.

k.     Titles of vehicles, motorcycles, boats, and other property;

l.      Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursements of funds.

<u>ATTACHMENT A-4</u>

SUBJECT VEHICLE 1.  A 2024 blue Nissan Altima, bearing New York Registration LGG1208.



The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. Secs. 841(a)(1) and 846, namely:

a.     Controlled substances, including, heroin; fentanyl; crack cocaine; residue of heroin and fentanyl;

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

c.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

f.     Items of personal property that pertain to the identity of the person(s) within the premises, and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

g.     Cellular/digital wireless telephones, and smart cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes; personal computers, I-Pads, and other computerized devices capable of storing data electronically, and the contents thereof; external hard drives, thumb drives, memory cards, CDs and DVDs capable of storing data electronically, and the contents thereof; should any such items be seized, investigators will seek further legal process to review the contents stored on these devices.

h.     Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.     Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

j.     Firearms and ammunition.

k.     Titles of vehicles, motorcycles, boats, and other property.